**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FOX TELEVISION STATIONS, INC; TWENTIETH CENTURY FOX FILM CORPORATION; FOX BROADCASTING COMPANY, INC.; NBC UNIVERSAL MEDIA, LLC; UNIVERSAL NETWORK TELEVISION, LLC; OPEN 4 BUSINESS PRODUCTIONS, LLC; NBC SUBSIDIARY (KNBC-TV) INC; AMERICAN BROADCASTING COMPANIES, INC.; ABC HOLDING COMPANY, INC.; DISNEY ENTERPRISES, INC.; CBS BROADCASTING INC.; CBS STUDIOS INC.; BIG TICKET TELEVISION, INC.; TELEMUNDO NETWORK GROUP LLC; WNJU-TV BROADCASTING LLC, *Plaintiffs-Appellants*, <br><br> v. <br><br> AEREOKILLER, LLC; ALKIVIADES DAVID; FILMON.TV NETWORKS, INC.; FILMON.TV, INC.; FILMON.COM, INC.; FILMON X, LLC; DOES, 1–3, inclusive, *Defendants-Appellees.* | No. 15-56420 <br><br> D.C. No. 2:12-cv-06921-GW-JC <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted August 4, 2016
Pasadena, California

Filed March 21, 2017

Before: Diarmuid F. O'Scannlain, Johnnie B. Rawlinson,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge O'Scannlain

**SUMMARY**[*]

**Copyright**

Reversing the district court's partial summary judgment
in favor of defendants, the panel held that a service that
captures copyrighted works broadcast over the air, and then
retransmits them to paying subscribers over the Internet
without the consent of the copyright holders, is not a "cable
system" eligible for a compulsory license under the Copyright
Act.

Under § 111 of the Act, a "cable system" is eligible for a
so-called compulsory license that allows it to retransmit "a
performance or display of a work" that had originally been

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

broadcast by someone else—even if such material is copyrighted— without having to secure the consent of the copyright holder.  So long as the cable system pays a statutory fee to the Copyright Office and complies with other regulations, it is protected from infringement liability.

The panel concluded that § 111 was ambiguous on the question presented. Deferring to the Copyright Office's interpretation, the panel held that Internet-based retransmission services are not eligible for the compulsory license that § 111 makes available to "cable systems."

---

## COUNSEL

Neal Kumar Katyal (argued), Frederick Liu, and Matthew A. Shapiro, Hogan Lovells US LLP, Washington, D.C.; Thomas P. Schmidt, Hogan Lovells US LLP, New York, New York; Paul Smith, Jenner & Block LLP, New York, New York; Julie A. Shepard and Richard L. Stone, Jenner & Block LLP, Los Angeles, California; Eric D. Mason, James S. Blackburn, John C. Ulin, and Ronald L. Johnston, Arnold & Porter LLP, Los Angeles, California; Murad Hussain and Robert Alan Garrett, Arnold & Porter LLP, Washington, D.C.; for Plaintiffs-Appellants.

Ryan Geoffrey Baker (argued) and Scott M. Malzahn, Baker Marquart LLP, Los Angeles, California, for Defendants-Appellees.

Rodney A. Smolla, Wilmington, Delaware, for Amicus Curiae The Media Institute.

Mark S. Chenoweth and Cory L. Andrews, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Washington Legal Foundation.David B. Dreyfus, Directors Guild of America, Inc., Los Angeles, California; Anthony R. Segall, Writers Guild of America, West, Inc., Los Angeles, California;

Benjamin F. P. Ivins and Rick Kaplan, National Association of Broadcasters, Washington, D.C.; James R. Sigel and Joseph R. Palmore, Morrison & Foerster LLP, Washington, D.C.; Paul Goldstein, Morrison & Foerster LLP, San Francisco, California; for Amicus Curiae National Association of Broadcasters.

Ralph Oman, Pravel Professorial Lecturer in Intellectual Property and Patent Law, George Washington University Law School, Washington, D.C., as and for Amicus Curiae The Former Register of Copyrights of the United States of America.

Geoffrey Manne, International Center for Law and Economics, Portland, Oregon; Sam Kazman and Hans Bader, Competitive Enterprise Institute, Washington, D.C.; for Amici Curiae The Competitive Enterprise Institute and The International Center for Law and Economics.

David M. Lamb, Jordan A. Feirman, and Anthony J. Dreyer, Skadden Arps Slate Meagher & Flom LLP, New York, New York, for Amici Curiae National Football League, The Office of the Commissioner of Baseball DBA Major League Baseball, and The PGA Tour, Inc.

J. Matthew Williams and Jay A. Rosenthal, Mitchell Silberberg & Knupp LLP, Washington, D.C., for Amici

Curiae The American Society of Composers, Authors and Publishers; Broadcast Music, Inc.; The National Music Publishers' Association; The Recording Industry Association of America; The Recording Academy; and SESAC, Inc.

Susan Cleary, Vice President & General Counsel, Independent Film & Television Alliance, Los Angeles, California; David J. Feder and Kelly M. Klaus, Munger Tolles & Olson LLP, Los Angeles, California; for Amici Curiae Paramount Pictures Corporation, Warner Bros. Entertainment Inc., and Independent Film & Television Alliance.

Duncan W. Crabtree-Ireland and Danielle S. Van Lier, SAG-AFTRA, Los Angeles, California; David B. Dreyfus, Directors Guild of America, Inc., Los Angeles, California; Anthony R. Segall, Writers Guild of America, West, Inc., Los Angeles, California; for Amici Curiae Screen Actors Guild-America Federation of Television and Radio Artists; Directors Guild of America, Inc.; and Writers Guild of America, West, Inc.

Brandon Butler; Alexandra Wilson, Law Student; Glushko-Samuelson Intellectual Property Clinic, American University Washington College of Law, Washington, D.C.; for Amicus Curiae Consumer Federation of America.

Brandon Butler; Darlene Tzou, Law Student; Glushko-Samuelson Intellectual Property Clinic, American University Washington College of Law, Washington, D.C.; for Amicus Curiae National Federation of the Blind.

Mitchell L. Stoltz, Electronic Frontier Foundation, San Francisco, California; Brian Quinn, Jeffrey T. Pearlman, and

Phillip R. Malone, Mills Legal Clinic, Juelsgaard Intellectual Property and Innovation Clinic, Stanford, California; for Amici Curiae Electronic Frontier Foundation and Public Knowledge.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a service that captures copyrighted works broadcast over the air, and then retransmits them to paying subscribers over the Internet without the consent of the copyright holders, is a "cable system" eligible for a compulsory license under the Copyright Act.

I

A

The Copyright Act of 1976 gives copyright holders six "exclusive rights," including the exclusive right "to perform" copyrighted works "publicly." 17 U.S.C. § 106(4). The Act provides that "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer." *Id.* § 501(a). This case concerns an important limitation on the Act's provision for exclusive rights.

Under § 111 of the Act, a "cable system" is eligible for a so-called compulsory license that allows it to retransmit "a performance or display of a work" that had originally been broadcast by someone else—even if such material is copyrighted—without having to secure the consent of the

copyright holder. *Id.* § 111(c). So long as the cable system pays a statutory fee to the Copyright Office and complies with certain other regulations, it is protected from infringement liability. *Id.* § 111(c)–(d). Compulsory licenses are highly coveted, in no small part because, according to the Copyright Office, the royalty payments the Act requires cable companies to pay are "*de minimis*" when compared to the gross receipts and revenues the cable industry collects, a gap suggesting that the government-set rates fall well below market levels. U.S. Copyright Office, *Satellite Home Viewer Extension and Reauthorization Act § 109 Report* 43 (2008) ("SHVERA Report"); *see also id.* at 70.

This lawsuit pits a group of broadcast stations and copyright holders (collectively, "Fox") against an entity now known as FilmOn X ("FilmOn"). FilmOn operates a service that uses antennas to capture over-the-air broadcast programming, much of it copyrighted, and then uses the Internet to retransmit such programming to paying subscribers, all without the consent or authorization of the copyright holders. The Supreme Court recently held that such a service does "perform" the retransmitted works "publicly," and hence infringes the copyright holders' exclusive performance rights. *American Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498, 2503 (2014). Fox sued FilmOn for copyright infringement in 2012; in its most recent defense, FilmOn claims that it is a "cable system" eligible for a compulsory license under § 111.

The relevant provision of the Copyright Act defines "cable system" as follows:

> A "cable system" is a facility, located in any State, territory, trust territory, or possession of

> the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service. For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous communities under common ownership or control or operating from one headend shall be considered as one system.

17 U.S.C. § 111(f)(3). The parties offer dueling interpretations § 111, each grounded in various aspects of its text, its perceived purposes, and slices of its legislative history.

## B

The district court granted partial summary judgment to FilmOn, agreeing with it that it qualified as a "cable system" and was therefore potentially entitled to a compulsory license. The district court based its conclusion on what it took to be the plain meaning of § 111, as well as the Supreme Court's *Aereo* decision, which had analogized Internet-based retransmission services to cable companies in the course of deciding that Internet retransmissions count as "performances" under the Act's Transmit Clause, 17 U.S.C. § 101.

Recognizing that its ruling "involve[s] a controlling question of law as to which there is substantial ground for difference of opinion," however, the district court authorized an immediate appeal from its decision.  We granted Fox's petition for permission to appeal.**[1]**

II

"We review *de novo* both the district court's grant of summary judgment and its holdings on questions of statutory interpretation."  *Phoenix Mem'l Hosp. v. Sebelius*, 622 F.3d 1219, 1224 (9th Cir. 2010).  But before turning to the parties' interpretations of § 111, it is crucial to point out that we do not confront §111's compulsory licensing scheme on a blank slate, because there is an agency interpretation in the background.  The Copyright Office—the agency charged with implementing the Copyright Act—has for many years maintained that Internet-based retransmission services are *not* "cable systems" and hence are not eligible for compulsory licenses under § 111.  Thus, when FilmOn attempted to pay the government-prescribed fee for retransmitting copyrighted

---

**[1]** As of this writing, at least seven federal courts have weighed in on whether Internet-based retransmission services count as "cable systems" under § 111.  The district court here is the only one to conclude that they do.  A panel of the Second Circuit unanimously said no. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 276 (2d Cir. 2012) (*ivi II* ).  So have five district courts: three in the Southern District of New York, one in the District for the District of Columbia, and one in the Northern District of Illinois. *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 600 (S.D.N.Y. 2011) (*ivi I*); *Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 7 (D.D.C. 2015); *Filmon X, LLC v. Window to the World Commc'ns, Inc.*, No. 13 C 8451, 2016 WL 1161276, at *7 (N.D. Ill. Mar. 23, 2016); *CBS Broad. Inc. v. FilmOn.com, Inc.*, No. 10 CIV. 7532 NRB, 2014 WL 3702568, at *4 (S.D.N.Y. July 24, 2014); *Am. Broad. Cos., Inc. v. Aereo, Inc.*, No. 12-CV-1540, 2014 WL 5393867, at *3 (S.D.N.Y. Oct. 23, 2014).

broadcast programming, the Office refused to accept FilmOn's filings, citing its position that Internet-based retransmission services are not covered by § 111.

Fox and FilmOn each claim that the plain meaning of § 111 resolves this case in its favor. We will first discuss Fox's interpretation, then FilmOn's, and only then—if we conclude that the meaning of § 111 is ambiguous on the question presented—will we consider the views of the Copyright Office.

### III

### A

Fox maintains that § 111's "plain text makes clear that the relevant 'facility' comprises the *entire* retransmission service—both the service's means of receiving broadcast signals *and* its means of making secondary transmissions to the paying subscribers." The Copyright Office has not endorsed this interpretation. Nevertheless, under Fox's reading, FilmOn would necessarily be excluded from § 111's definition of "cable system" because FilmOn retransmits broadcast signals over the Internet, and yet the Internet "is in no sense under [its] ownership or control." Indeed, FilmOn concedes that it "uses a communications channel beyond its facility" to make secondary transmissions. "That concession," says Fox, "should decide this case."

Fox's theory is not implausible. As Fox points out, and as FilmOn does not dispute, "[a] traditional cable system is a 'facility' in this sense: It . . . retransmits [broadcast] signals directly to its subscribers over a transmission path fully within its control." Nevertheless, we cannot conclude that the

statute *compels* the conclusion that to qualify as a "cable system," a retransmission service must encompass or have control over the means it uses to transmit material to paying subscribers.

The most important difficulty with Fox's interpretation is that it finds insufficient support in the text of the statute. Recall the relevant language: to be a "cable system," a facility must "make[] secondary transmissions of [broadcast] signals or programs *by* wires, cables, microwave, or other communications channels." 17 U.S.C. § 111(f)(3) (emphasis added). Nothing in that language on its face compels the conclusion that the facility must *control* the retransmission medium—the wires, cables, microwaves, or other communications channels—that it relies on to deliver its retransmissions. Fox does not cite any specialized or technical meaning, and as a matter of ordinary interpretation, the text could certainly be read the other way. *Cf.* Black's Law Dictionary 182 (5th ed. 1979) (defining "by" as "[t]hrough the means, act, agency, or instrumentality of"). For instance, someone who deposits a letter in a mailbox could certainly be said to "transmit" his letter "by mail," even though he does not control the mail system that actually delivers his letter to its recipient. Likewise, it would be reasonable to say that someone "makes a transmission" of money "by wire" when he initiates an electronic funds transfer through Western Union, even though he does not have any possession or control over the wires that transport his money to its destination. (Indeed, the British soldiers Paul Revere warned of were certainly making their advance "by sea," even though they in no sense controlled the Charles River. Henry Wadsworth Longfellow, *The Landlord's Tale: Paul Revere's Ride*, *reprinted in* Henry Wadsworth

Longfellow: Poems and Other Writings 362, 362 (J.D. McClatchy ed., 2000).)

In addition, § 111(a)(3) specifically discusses a scenario in which one entity selects the content or recipients of a secondary transmission, while a different entity supplies the communications channel. According to that provision, a "carrier" who "provid[es] wires, cables, or other communications channels for the use of others" is not liable for copyright infringement, while the upstream entity who exercises "control over the content or selection of the primary transmission or over the particular recipients of the secondary transmission" may be liable. 17 U.S.C. § 111(a)(3). Section 111(a)(3), therefore, suggests that a facility may be said to make secondary transmissions even if it does not exercise ownership or control over the communications channel it uses. If that is true, then FilmOn's lack of ownership or control over the Internet does not necessarily exclude it from the class of facilities that "make[] secondary transmissions . . . by wires, cables, microwave, or other communications channels." *Id.* § 111(f)(3).

### B

Although Fox's plain-meaning construction has not convinced us, Fox can prevail if we defer to the views of the Copyright Office. FilmOn urges us not to do so because, FilmOn insists, the plain meaning of § 111 supports *its* position. FilmOn strives mightily to demonstrate that the plain meaning of § 111 unambiguously entitles it to a compulsory license.

FilmOn first argues that § 111 "should be interpreted in a technology agnostic manner." FilmOn would have us read

§ 111 as making compulsory licenses available to *any* facility that retransmits broadcast signals or programming, no matter its technological features or characteristics.  That position is a poor fit with § 111's text and structure.  First of all, if Congress had intended § 111 to service the entire secondary transmission community, doling out statutory licenses without regard to the technological makeup of its members, it would have been easy enough for Congress to say so (and in fact, Congress came very close to doing just that in the Transmit Clause, 17 U.S.C. § 101, as we discuss in the next paragraph).  Instead, Congress specified that § 111 applies only to "cable systems," and it defined "cable system" in a detailed, if arguably ambiguous, way.  Second, and relatedly, if Congress meant § 111 to sweep in secondary transmission services with indifference to their technological profile, then it was strange for Congress to have provided separate compulsory license provisions—§§ 119 and 122—for broadcast retransmissions by satellite carriers.  17 U.S.C. §§ 119, 122.  The way to prevent discrimination on the basis of technology, one might say, is to stop discriminating on the basis of technology.  Congress chose a different course.

Undeterred, FilmOn relies on the Supreme Court's recent decision in *Aereo*, which, FilmOn insists, "recognized section 111's technology agnosticism."  But *Aereo* did nothing of the sort.  *Aereo* dealt with an altogether different provision of the Copyright Act, the Transmit Clause, which defines the scope of a copyright holder's exclusive right by delineating the class of activities that count as public performances and hence infringe such right.  *See* 17 U.S.C. § 101. Significantly, the Transmit Clause refers in sweeping terms to transmissions or communications made "by means of *any* device or process," and broadly defined "device" and "process" to mean "one now known *or later developed*."

17 U.S.C. § 101 (emphasis added). The glaring textual differences between § 101 and § 111 render the *Aereo* decision of very little help to FilmOn's plain-meaning argument. Moreover, it would be perfectly coherent to pair a broad reading of the Transmit Clause with a narrow reading of the compulsory license provision, insofar as both such readings would work in tandem to bolster the property interests of copyright holders. Nothing in § 111 or *Aereo* makes such a reading unreasonable.

We also cannot accept FilmOn's assertion that it clearly satisfies § 111's requirement that a cable system make secondary transmissions by "wires, cables, microwave, or *other communications channels*." 17 U.S.C. § 111(f)(3) (emphasis added). It is far from clear whether the Internet counts as one of the "other communications channels" envisioned by § 111. For instance, Fox's expert explained that "a communications channel in electrical engineering terms has the characteristics set forth by Claude Shannon in his seminal paper, 'Communication In The Presence of Noise.' The defining characteristics of a communications channel are bandwidth, noise and throughput. The Internet is not a communications channel."[2]

Moreover, it would be perfectly reasonable to interpret "other communications channels" according to the *ejusdem generis* canon, which instructs that "when a statute sets out a

---

[2] Strikingly, FilmOn also relies on the work of Claude Shannon, but offers its own more favorable, but still highly technical, interpretation of "communications channel." Far from illuminating § 111's plain meaning, however, FilmOn's decision to serve up a rival technical definition suggests that this is an issue better left to an expert agency than a federal court.

series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." *Hall St. Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008). Invoking such canon, one could reasonably conclude that the "other communications channels" must share characteristics such as bandwidth, throughput, and noise; alternatively, one could conclude, as the Copyright Office does, that such channels must be "inherently localized transmission media of limited availability." Either interpretation would imply that the Internet is not an "other communications channel" under § 111. We cannot conclude that § 111 unambiguously requires otherwise.

Nor can we conclude that the Copyright Act's broad purposes compel the conclusion that Internet-based retransmission services are eligible for compulsory licenses under § 111. Rather, we see powerful arguments that such a reading could very well undermine the balance of interests Congress attempted to strike when it designed § 111. That is especially so when § 111 is viewed in the context of its enactment.

In brief, when Congress passed the Copyright Act of 1976, it overturned two earlier Supreme Court decisions which had held that cable systems were not liable for copyright infringement on the theory that they did not actually "perform" the works they retransmitted at all. *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394, 408 (1974); *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390, 399 (1968). Congress therefore acted to restore a measure of protection to copyright owners. At the same time, however, Congress recognized that cable systems served an important public good, by enabling

geographically distant and isolated communities to receive over-the-air broadcasts that would otherwise not reach them. But in 1976 the cable industry was a fledgling one; cable systems had little market power and little ability to overcome the considerable transaction costs they would incur if they had to negotiate individual licenses directly with copyright owners. Congress responded to these economic conditions by enacting § 111, which relieved cable systems of the need to sit down with every copyright holder before retransmitting their copyrighted broadcast works. Section 111 also helped protect the infrastructure investments cable systems have undertaken in the years prior to the Act. And the broadcast companies and copyright owners benefitted to some extent as well, insofar as they could now reach viewers they would not otherwise have been able to access. Fundamentally, however, § 111 was Congress's attempt to balance the socially useful role cable systems had come to play, on the one hand, against the property interests and creative incentives of copyright holders, on the other.

One could reasonably conclude that extending § 111 to Internet-based retransmission services would not further, and might in fact jeopardize, the values just described. For one, cable systems serve limited geographic communities, but an Internet-based service has no geographic boundary—it can retransmit works across the globe instantaneously—meaning that Internet-based retransmission poses a more serious threat to the value and integrity of copyrighted works. Such threat is exacerbated insofar as Internet retransmissions are more vulnerable than traditional cable to unauthorized copying and other acts of piracy. For another, many copyright owners are capable of transmitting their works over the Internet on their own; they do not need to rely on third parties to do so, as they had to rely on cable companies if they wanted to reach the

isolated, distant communities cable systems traditionally served. Relatedly, compared to cable systems and satellite carriers, Internet-based retransmission services have not needed to make the same sort of investments in a delivery platform infrastructure. Finally, there is no evidence that Internet-based services lack market power or face prohibitive transaction costs of the sort that justified the compulsory license for cable systems.

To be sure, we agree with FilmOn that there are important values on its side of the equation as well. Still, our conclusion from this discussion is a predictable one: the array of competing interests at stake does not unambiguously counsel for or against a broad reading of § 111.

Additionally, throughout its brief FilmOn invokes the statute's legislative history. Unsurprisingly, however, there is plenty of legislative history to go around, as Fox and the Copyright Office make extensive use of it as well. At best, we think the legislative history is a wash; it certainly does not compel the conclusion that § 111 must be interpreted to be "technology agnostic," or that Internet-based retransmission services must be deemed "cable systems." To the extent the legislative history provides relevant evidence of § 111's meaning, we would defer to the Copyright Office's interpretation of it, seeing as the Copyright Office has a much more intimate relationship with Congress and is institutionally better equipped than we are to sift through and to make sense of the vast and heterogeneous expanse that is the Act's legislative history.

Finally, we note two additional reasons to reject FilmOn's argument that § 111 must be read to encompass Internet-based retransmission services.

As courts have explained in the past, compulsory licenses represent a "limited exception to the copyright holder's exclusive right to decide who shall make use of his [work]," and courts should not "expand the scope of the compulsory license provision beyond what Congress intended . . . nor interpret it in such a way as to frustrate that purpose." *Fame Publishing Co. v. Ala. Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975). Such canon supports a narrow construction of § 111.

Additionally, as Fox points out, interpreting § 111 so as to include Internet-based retransmission services would risk putting the United States in violation of certain of its treaty obligations. An age-old canon of construction instructs that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804). FilmOn does not have a satisfactory answer to this argument.

For the foregoing reasons, we cannot accept FilmOn's argument that § 111 *must* be read in such a way as to make Internet-based retransmission services eligible for compulsory licenses. All of that being said, however, we would not go so far as to conclude that it would be clearly *impermissible* to say that FilmOn qualifies for a compulsory license under § 111. The text of § 111 is written in broad terms, and both sides can make plausible arguments about the statute's purposes and legislative history. Hence, although we do not believe the interpretive scales are in equipoise, we do not foreclose the possibility that the statute could reasonably be read to include Internet-based retransmission services.

IV

Because the statute does not speak clearly to the precise question before us, we must decide how much weight to give the views of the Copyright Office.  The Copyright Office has published its views on the meaning of § 111 through a few different channels.  We group them into two broad categories.

First, in 1992 and again in 1997 the Office engaged in notice-and-comment rulemaking in order to decide whether burgeoning retransmission technologies—specifically, satellite and microwave retransmission systems—could be classified as "cable systems" under § 111.  The 1992 and 1997 rulemakings did not purport to consider Internet-based retransmission services.  In the final rules' preambles, however, the Office stated broadly "that a provider of broadcast signals [must] be an inherently localized transmission media of limited availability to qualify as a cable system."  *Cable Compulsory Licenses: Definition of Cable Systems*, 62 Fed. Reg. 18,705-02, 18,707 (April 17, 1997) (codified at 37 C.F.R. pt. 201); *see also Cable Compulsory License; Definition of Cable System*, 57 Fed. Reg. 3284-01, 3292 (Jan. 29, 1992) (codified at 37 C.F.R. pt. 201) ("Examination of the overall operation of section 111 proves that the compulsory license applies only to localized retransmission services.").  Everyone acknowledges that the foregoing interpretation of "cable system" would rule out Internet-based retransmission services like FilmOn.  But the parties disagree sharply about whether such interpretation should have any bearing on our analysis.

That brings us to the second batch of Copyright Office interpretations relevant to this litigation.  Since 1997, the Office has on at least four occasions specifically and unequivocally said that, in its view, Internet-based retransmission services are not "cable systems" under § 111,

but it has not done so in connection with any rulemaking. Instead, the Office has communicated its position largely through official reports and testimony before Congress.

### A

The first question is whether *Chevron* or *Skidmore* provides the proper framework to structure our analysis.[3] The parties debate this issue at length. It has divided our colleagues as well: while the Second Circuit said *Chevron* deference is appropriate, *ivi II*, 691 F.3d at 279, district courts in the Southern District of New York, the District of Columbia, and the Northern District of Illinois all applied the less deferential *Skidmore* framework instead, *ivi I*, 765 F. Supp. 2d at 604–05; *Fox Television Stations*, 150 F. Supp. 3d at 27; *Window to the World Commc'ns*, 2016 WL 1161276, at *12. Notably, each of the courts applying *Skidmore* had no trouble accepting the Office's position when all was said and done.

---

[3] Under *Chevron*, "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). First, we must determine "whether Congress has directly spoken to the precise question at issue." *Id.* We have already concluded that Congress has not done so. Our second question then becomes merely "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

The *Skidmore* framework is less deferential. Under *Skidmore*, the weight we give to an agency interpretation "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

To resolve this issue, we would be required to rule on constitutional questions that could have outsized consequences relative to this case—such as determining whether the Library of Congress is a legislative or executive agency.[4]  However, it is clear the Copyright Office is entitled to at least *Skidmore* deference.  *E.g.*, *Alaska Stock, LLC v. Houghton Mifflin Harcourt Pub. Co.*, 747 F.3d 673, 684–85 (9th Cir. 2014) ("[W]e defer to the Copyright Office's views . . . to the extent that those interpretations have the power to persuade.").  And, whether *Chevron* or *Skidmore* applies ultimately does not affect the conclusion we reach.  We therefore adhere to the "well established principle . . . [that] the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case" and will proceed under the *Skidmore* framework.  *See Bond v. U.S.*, 134 S. Ct. 2077, 2087 (2014) (citing *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam)).

B

Under *Skidmore*, and having already determined that the meaning of § 111 is ambiguous on the precise question before

---

[4] The Copyright Office is housed within the Library of Congress, and it is not clear whether the Library of Congress is part of the executive or legislative branch.  *Compare U.S. v. Brooks*, 945 F. Supp. 830, 834 (E.D. Pa. 1996) ("[T]he Copyright Office is part of the legislative branch."), *with Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341–42 (D.C. Cir. 2012) (discussing why the Library of Congress "is undoubtedly a 'component of the Executive Branch'").  If the Library of Congress is part of the legislative branch, then the Librarian's "power to appoint all of the officers who execute the copyright laws" may run afoul of the Appointments Clause of the Constitution.  *See* John Duffy et al., *Copyright's Constitutional Chameleon*, Concurring Opinions (May 17, 2013),  https://concurringopinions.com/archives/2013/05/copyrights-constitutional-chameleon.html#more-74811.

us, we must now ask whether the Copyright Office's interpretation is persuasive and reasonable. To do so we review "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *U.S. v. Mead Corp.*, 533 U.S. 218, 228 (2001) (citing *Skidmore*, 323 U.S. at 140).

First, the Office's decision to reject Internet-based retransmission services because they do not use a localized retransmission medium finds sufficient support in the text, structure, and basic purposes of the Copyright Act. Such interpretation aligns with § 111's many instances of location-sensitive language, including "headends," 17 U.S.C. § 111(f)(3), "contiguous communities," *id.*, and "distant signal equivalent," *id.* §§ 111(d)(1)(B)–(C), (d)(1)(E)–(F), (f)(5). As the Office points out—and as FilmOn does not dispute—such references "would have no meaning when applied to . . . nationwide retransmission facilities." 56 Fed. Reg. at 31,588. Nor does FilmOn dispute the Office's claim that "at the time Congress created the cable compulsory license, the FCC regulated the cable industry as a highly localized medium of limited availability, suggesting that Congress, cognizant of the FCC's regulations and the market realities, fashioned a compulsory license with a local rather than a national scope." 62 Fed. Reg. at 18,707.

Furthermore, confining "cable systems" to localized retransmission media is a sensible way to construe the phrase "other communications channels" so that it does not sweep in every possible retransmission technology. The Office's position is not rigidly originalist, as its ability to accommodate Satellite Master Antenna Television systems demonstrates. Rather, it is a plausible attempt to maintain the balance Congress struck between the public's interest in ever-

improved access to broadcast television and the property rights of copyright holders. "The interpretation makes considerable sense in terms of the statute's basic objectives," *Barnhart*, 535 U.S. at 219, as well as its text.

The Office has maintained a consistent position on this issue since it first expressed its views in 1992. 57 Fed. Reg. at 3292; 62 Fed. Reg. at 18,707. In articulating its position the agency has consistently referenced the statute's text, structure, and legislative history. *E.g.*, 57 Fed. Reg. at 3292; *see also id.* at 3290 (endorsing the view that "the terms of section 111, when considered as a whole, make it obvious that the license is directed to localized transmission services," and that § 111 "do[es] not have any application to a nationwide retransmission service such as satellite carriers."). Since 1997, the Office has on at least four occasions explicitly concluded that Internet-based retransmission services are not "cable systems" under § 111.

Lest there be any doubt, we note that for years Congress has indisputably been aware of the Office's position that Internet-based services are ineligible under § 111, and yet "Congress has frequently amended or reenacted the relevant provisions without change." *Barnhart*, 535 U.S. at 220. As the district court for the District of Columbia recounted:

> Congress has been fully aware of the Copyright Office's longstanding interpretation. Despite this awareness, Congress has neither amended the text of § 111 nor enacted a separate compulsory-licensing scheme to include Internet-based retransmission services. However, Congress has repeatedly amended the statute in other

respects. For example, it amended the cable system definition to include the term 'microwave' and enacted the licensing scheme for satellite providers. As recently as 2014, . . . Congress amended the Copyright Act without rejecting or altering the Copyright Office's interpretation.

*Fox Television Stations*, 150 F. Supp. 3d at 26–27 (internal citations omitted); *see also ivi I*, 765 F. Supp. 2d at 616 (same). "These circumstances provide further evidence—if more is needed—that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible." *Barnhart*, 535 U.S. at 220; *see also Greenhorn Farms v. Espy*, 39 F.3d 963, 965 (9th Cir. 1994).[5]

The Office's position is longstanding, consistently held, and was arrived at after careful consideration; and it addresses a complex question important to the administration of the Copyright Act. Not only that, but Congress has effectively acquiesced in it. We are persuaded that all of this more than suffices under *Skidmore*. *See Mead*, 533 U.S. at 228.

---

[5] Similarly, when the Office denied satellite carriers a § 111 license on grounds that they do not use a localized retransmission medium, Congress responded by enacting a new compulsory license provision in § 119. By contrast, when the Office denied Multichannel Multipoint Distribution Service ("MMDS") a § 111 license—even though MMDS comports with the localized-retransmission requirement, *see* 57 Fed. Reg. at 3293–94—Congress responded by amending § 111. Such differential treatment maps onto the Office's view that § 111 embraces only those retransmission services that utilize inherently localized media.

V

FilmOn and other Internet-based retransmission services are neither clearly eligible nor clearly ineligible for the compulsory license § 111 makes available to "cable systems." The Copyright Office says they are not eligible.  Because the Office's views are persuasive, and because they are reasonable, we defer to them.  The judgment of the district court is therefore

**REVERSED.**